DANIEL E. MORGAN, PROSECUTOR, v. CIVIL SERVICE COMMISSION OF THE STATE OF NEW JERSEY, DEFENDANT.

Submitted October 5, 1943—Decided April 14, 1944.

Before Justices Parker, Heher and Perskie.

For the prosecutor, *Major & Carlsen* (*James A. Major,* of counsel).

For the defendant, *David T. Wilentz,* Attorney-General, and *Harry A. Walsh,* Assistant Attorney-General.

The opinion of the court was delivered by

Heher, J. The Civil Service Commission certified prosecutor as first on the roster of eligibles, with the status of a "disabled war veteran," for appointment to fill a vacancy in the position of "bridge attendant" in the Bergen County service. He was the only war veteran certified; and the appointing authority, the Board of Chosen Freeholders, was therefore under a peremptory duty to appoint him to the vacant position, unless there was "good cause" to the contrary. *Chapter 381 of the Laws of 1938* (*Pamph. L., p.* 951) ; *N. J. S. A.* 11 :27-4, 11 :27-5.

The Freeholders refused to make the appointment on the sole ground, it is conceded, that prosecutor had declared an unwillingness "to salute the flag of the United States." He is an adherent of the religious sect known as "Jehovah's Witnesses;" and he said that, while he "respected" the nation's emblem, he deemed the salute to be in contravention of the "laws of God." He interprets the Bible as forbidding "salutation to inanimate objects, because inanimate objects cannot receive that salutation." But he said that he "would pledge" his allegience to the government and "to the things for which the flag stands." The Witnesses deem the flag to be an "image" within the prohibition of Exodus, chapter 20, verses 4 and 5.

Prosecutor appealed to the Civil Service Commission. That tribunal sustained the action of the Freeholders. It found that, although prosecutor had qualified for the positions in competitive civil service examinations, he did not render "satisfactory service" as a probationary motor vehicle inspector in the year 1938, and in a training school conducted at

the Rahway Reformatory for prison and reformatory officers, subsequent to the civil service examination for the position, he demonstrated that he was "of a highly nervous disposition" and "temperamentally unsuited to service as a prison and reformatory officer." The Commission held that it is not its "function * * * to rule on the question of whether his beliefs disqualify him for public employment," but that the Board of Freeholders "is not acting arbitrarily or beyond its reasonable authority when it requires that public employees under its jurisdiction shall salute, and be willing to salute, the Flag on appropriate occasions and otherwise conform to the patriotic practices recognized by law and custom as commendable and proper by the great body of citizens of this State and of the United States." It also found that prosecutor is not "able to devote himself to the daily routine performance of the duties of the position, properly and effectively perform those duties, accept and observe reasonable directions from his supervising officers and work in co-operation with his fellow employees."

It is not within the province of the appointing authority to deny prosecutor his statutory right to the appointment in issue on the ground that he entertains religious scruples against the patriotic exercise of saluting the flag. The legislature has not ordained that the right to hold a public office or position may be conditioned upon observance of a compulsory flag-salute ritual. Nor would such a regulation be within its competency. It is not merely a question of the right to an exemption, on religious grounds, from a general legal duty to give the salute. The legislative body does not possess the power thus to control the mind of the individual. The supreme arbiter of the meaning of federal constitutional limitations has lately ruled that such a precept directed to public school pupils by the local regulatory body invades the sphere of intellect and spirit reserved from all official control by the First and Fourteenth Amendments of the nation's organic law. Freedom of religious conscience and belief, and of speech and of press, secured by these amendments is susceptible of restriction only to prevent grave and immediate

danger to interests which the state may lawfully protect. It is not within the power of officialdom to coerce individual affirmation of a belief and an attitude of mind—to compel the individual to give utterance to what is not in his mind. The flag salute is a form of utterance. Coerced acceptance of a patriotic creed is beyond official authority. The conscience of the individual may not thus be trammeled. The Bill of Rights enjoins such assertions of official authority. The Fourteenth Amendment, as now applied to the states, protects the citizen against the state itself and all of its creatures. It safeguards against hostile state action the individual freedom of mind preserved against Congressional abridgement by the First Amendment. Government itself exists by the consent of the governed; and the Bill of Rights forbids coercion of that consent by those in power. No official, high or petty, "can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their belief therein." *West Virginia State Board of Education* v. *Barnette,* 319 *U. S.* 624; 63 *S. Ct.* 1178; 87 *L. Ed.* 1628.

The cherished constitutional liberties guaranteed against impairment by state action prohibit governmental intrusions into the consciences of men. Government may not command individual belief or declaration of belief contrary to faith: nor may it enjoin the harboring of thoughts contrary to one's convictions. The "mind and spirit of man remains forever free, while his actions rest subject to necessary accommodations to the competing needs of his fellows." *Jones* v. *City of Opelika,* 316 *U. S.* 584; 62 *S. Ct.* 1231; 86 *L. Ed.* 1691. The liberty of religious conscience guaranteed by the due process clause of the Fourteenth Amendment "embraces two concepts—Freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected

freedom." *Cantwell* v. *State of Connecticut,* 310 *U. S.* 296; 60 *S. Ct.* 900; 84 *L. Ed.* 1213. See, also, *Chaplinsky* v. *State of New Hampshire,* 315 *U. S.* 568; 62 *S. Ct.* 766; 86 *L. Ed.* 1031; *Schneider* v. *State of New Jersey,* 308 *U. S.* 147; 60 *S. Ct.* 146; 84 *L. Ed.* 155; *Grosjean* v. *American Press Co.,* 297 *U. S.* 233; 56 *S. Ct.* 444; 80 *L. Ed.* 660. The flag salute is deemed of much less consequence to the common-weal than the religious and intellectual sovereignty of the individual.

These are the considerations which govern the application to the states of the specific inhibitions of the First Amendment (in itself constituting a limitation upon the federal government only), through the operation of the Fourteenth Amendment. Did the conditioning of prosecutor's right to the public position in question upon a willingness to render the flag salute constitute an invasion of the freedom of worship, of speech and of the press thus guaranteed by the Fourteenth Amendment against impairment by state action?

The protection accorded to citizens of the United States by the "privileges and immunities" clause has reference merely to those rights and privileges which, under the constitution and laws of the United States, are incident to citizenship of the United States, but does not include rights pertaining to state citizenship and annexed solely to the relation between the citizen and his state established by state law. *Madden* v. *Kentucky,* 309 *U. S.* 83; 60 *S. Ct.* 406; 84 *L. Ed.* 590. And quite recently, on January 17th last, the Federal Supreme Court reaffirmed the rule laid down nearly a half century ago that the unlawful denial by state action of a right to state political office is not a deprivation of the liberty or of a right of property secured by the due process clause of the Fourteenth Amendment. Yet a state office or position may be the subject of intentional or purposeful discrimination between persons or classes, constituting a denial of the equal protection of the laws. Where discrimination is sufficiently shown, the right to relief under the "equal protection" clause is not diminished by the fact that the discrimination relates to political rights. *Snowden* v. *Hughes,* 321

*U. S.* 1; 64 *S. Ct.* 397; 88 *L. Ed.* 347. See, also, *Nixon* v. *Herndon,* 273 *U. S.* 536; 47 *S. Ct.* 446; 71 *L. Ed.* 759; *Wilson* v. *North Carolina,* 169 *U. S.* 586; 18 *S. Ct.* 435; 42 *L. Ed.* 865. This guaranty "was aimed at undue favor and individual or class privilege, on the one hand, and at hostile discrimination or the oppression of inequality, on the other. It sought an equality of treatment of all persons, even though all enjoyed the protection of due process." *Truax* v. *Corrigan,* 257 *U. S.* 312; 42 *S. Ct.* 124; 66 *L. Ed.* 254.

It is the sovereign right of the people to choose their own civil servants. Such service is a political privilege—not a natural or inherent right—that may be the subject of reasonable conditions for the public good, if not in conflict with the federal or state constitutions. The power of the states to prescribe the qualifications of their own officers is exclusive and free from external interference, except so far as plainly provided by the federal constitution. This freedom in the states' political and internal administration is essential to their independence and to their peace and tranquility. *Taylor* v. *Beckham,* 178 *U. S.* 548; 20 *S. Ct.* 890; 44 *L. Ed.* 1187; *State, ex rel. Workman* v. *Goldhait,* 172 *Ind.* 210; 87 *N. E. Rep.* 133. The equality of protection secured by the Fourteenth Amendment "extends only to civil rights, as distinguished from those which are political or arise from the form of government and the mode of its administration." *Ex parte Virginia,* 100 *U. S.* 339; 25 *L. Ed.* 667, 676.

But we have no occasion to consider whether there has been a denial here of that equality of right and of opportunity which is implicit in the federal constitutional guaranty of the equal protection of the laws, or of liberty in disregard of the due process clause. Our own Bill of Rights embodies the like guaranties of religious and intellectual liberty. Article 1, paragraph 3, of the state constitution ordains, *inter alia,* that "No person shall be deprived of the inestimable privilege of worshipping Almighty God in a manner agreeable to the dictates of his own conscience; nor under any pretense whatever be compelled to attend any place of worship contrary to his faith and judgment." Paragraph 4 of

the same article declares that "There shall be no establishment of one religious sect, in preference to another; no religious test shall be required as a qualification for any office or public trust; and no person shall be denied the enjoyment of any civil right, merely on account of his religious principles." And paragraph 5 provides that "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right;" and that "No law shall be passed to restrain or abridge the liberty of speech or of the press."

The state courts are, of course, under no federal restraint in the determination of the meaning of the provisions of the state constitutions, provided they are not violative of federal constitutional limitations or jurisdiction, although the interpretation of the Federal Supreme Court is generally esteemed "strongly persuasive" where the subject-matter is a federal constitutional provision similar to that of the state constitution. Ordinarily, the public interest is served by consistency of decision and the avoidance of conflict where the organic provisions are essentially the same. *State Board of Milk Control* v. *Newark Milk Co.,* 118 *N. J. Eq.* 504; *Midwestern Petroleum Corp.* v. *State Board of Tax Commissioners,* 206 *Ind.* 688; 191 *N. E. Rep.* 153; *Goldsmith* v. *Mead Johnson & Co.,* 176 *Md.* 682.; 7 *Atl. Rep.* (2d) 176; *Gabrielli* v. *Knickerbocker,* 12 *Cal.* (2d) 85; 82 *Pac. Rep.* (2d) 391; *People* v. *Budd,* 117 *N. Y.* 1; 22 *N. E. Rep.* 670.

As respects the matter here in controversy, these constitutional guaranties must needs have the same quality and meaning as similar inhibitions of the First Amendment, secured against adverse state action by the Fourteenth Amendment. The flag is a national emblem, symbolizing adherence to government as now constituted; and, since the federal constitution, as read by the supreme interpretative authority, interdicts compulsory individual declaration of belief in the principles and political ideas thus represented for reasons of conscience and intellectual freedom, we cannot but give the flag salute the like sense and significance in the application of the guaranties of civil liberty contained in our own Bill

of Rights. We note the observation of Mr. Justice Jackson in the majority opinion in the *West Virginia case, supra,* that, even in a matter so vital as raising the Army, the Congress has made flag observance wholly voluntary, thus respecting the conscience of the objector; and also that prosecutor here has avowed his attachment to the government and to "the things for which the flag stands."

Our Bill of Rights safeguards the individual's right to speak his own mind, uninfluenced by civil or political disabilities. The cited guaranties of personal liberty plainly forbid disqualification from the public service for one's religious or political opinions. These constitutional freedoms are limitable only where vital to the protection of an imperative paramount interest of the state. It is an inherent power of sovereignty to regulate conduct inimical to the public welfare. *State* v. *Klapprott,* 127 *N. J. L.* 395. But these treasured civil and religious liberties yield only to grave public exigencies. As said, under the Federal Constitution restriction of such liberties is justifiable only to avert "grave and immediate danger to interests which the state may lawfully protect;" and this interpretation is, of course, binding on the states so far as the Fourteenth Amendment is operative. *West Virginia State Board of Education* v. *Barnette, supra.* It is to be observed that, under our constitution, there is a distinction between natural, civil and political rights. *Percey* v. *Powers,* 51 *Id.* 432. But that is of no moment here. Individual liberty of conscience, of speech and of press, may not be indirectly qualified by political incapacitations. Since the federal authority does not consider the flag salute to be a matter of vital public concern, transcending these fundamental civil and religious freedoms, the states would hardly be justified in considering it as having that attribute.

And personal unfitness in other respects was not the ground taken by the Board of Freeholders in denying the vacant position to prosecutor; nor was such an issue litigated before the Civil Service Commission. That tribunal's disqualification of prosecutor therefore cannot be justified on that basis.

Under the statute, the fact that a war veteran has passed the examination prescribed by the Civil Service Commission and has been certified as eligible for appointment "is evidence that such veteran is qualified to perform the duties of the position and as entitling him to appointment; and he cannot be deprived of this peremptory statutory right unless "good cause" be shown to the Civil Service Commission at a time when the veteran "may be privileged to attend and present evidence." *Chapter* 381 *of the Laws of* 1938, *supra; N. J. S. A.* 11:27–5. The disqualification of prosecutor for reasons not made the subject of a hearing plainly contravened this provision. He was denied the very essence of the hearing thereby guaranteed. Condemnation on grounds not assigned and heard on notice is alien to basic concepts of fair and just procedure. A candidate's acquired eligibility may not be arbitrarily nullified. Moreover, inability to perform the duties of the positions of motor vehicle inspector and prison officer is not necessarily a disqualification for the work of a bridge attendant. The act protects the public service against demonstrated unfitness. There is a provision for probationary service. *R. S.* 11:22–6.

The order of the Civil Service Commission is accordingly reversed, but without costs.

PARKER, J. (Concurring on result.) I agree that the refusal of the Board of Freeholders to appoint the prosecutor because of his refusal to salute the flag, was illegal because that reason was beyond the scope of their statutory authority. I further agree that the question of "personal unfitness," not raised by or before the Board of Freeholders, was not properly before the Civil Service Commission on the appeal. These considerations suffice for a reversal. As regards the merits of the question with respect to refusal to salute the flag, which have been discussed at great length by many state tribunals, and decided both ways by the Supreme Court of the United States, I deem it more prudent to refrain from passing on them until they are directly involved in the decision of a case.