[Civ. No. 14459.   Second Dist., Div. One.   Nov. 2, 1944.]

CHARLES T. RUSSELL, Respondent, v. INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYES AND MOVING PICTURE MACHINE OPERATORS OF THE UNITED STATES OF AMERICA AND CANADA, Appellant.

Thomas W. Hughes, Bodkin, Breslin & Luddy and Bell, Murdock, Paxton & Green for Appellant.

Harry A. Daugherty and Frederick W. Mahl, Jr., for Respondent.

YORK, P. J.—Plaintiff by the instant action seeks to recover compensation for his services as an income tax consultant which, it is alleged, he rendered to defendant Alliance during the year 1941, together with certain expenses incurred in the rendition thereof.

The first cause of action of the complaint is based upon an express contract made by plaintiff with said Alliance through its international president, George E. Browne. The second and third causes of action are upon common counts for the reasonable value of the services and for money expended at the special instance and request of defendants, and the fourth cause of action is based upon a mutual, open and current book account.

The court found upon the first cause of action that the alleged contract was entered into on July 5, 1938, "whereby said defendant employed plaintiff to render services to said defendant and such of its locals, unions, officers and employees as defendant . . . might designate and said defendant further agreed at said time to pay plaintiff as compensation for said services the sum of $10,000.00 during the year 1938, to be paid $5,000.00 on July 5, 1938, and $5,000.00 on December 31, 1938, and the sum of $10,000.00 during each calendar year thereafter in which plaintiff performed services . . . together with such sums as were expended by plaintiff . . . in the performance of such services. . . . that said parties did not agree to any specific term for said employment but did agree . . . that said agreement could be terminated by either of the parties at any time." It was also found by the court that plaintiff from July 5, 1938, to December 31, 1941, rendered all the services required to be performed and that defendant had paid the agreed compensation for the calendar years 1938, 1939 and 1940, together with the sums expended in the rendition of services for those years, but that defendant had failed to pay for services rendered in the year 1941 and for the sums expended by plaintiff during that year.

The court made no finding respecting the second and third causes of action except that "if findings were to be made in connection therewith, the Court would find that the allegations of said complaint as set forth in said second and third causes of action are true."

Contemporaneously with said agreement, powers of attorney were given to plaintiff: one executed by George E. Browne, as international president on behalf of defendant Alliance;

another by George E. Browne, individually, and two executed by William Bioff and Harlan Holmden, respectively, both of whom were officers of the Alliance. These powers of attorney authorized plaintiff to represent the Alliance and the individuals named "in all Federal tax matters for all years before the Commissioner of Internal Revenue."

From an adverse judgment for the sum of $12,208.64, defendant Alliance prosecutes this appeal upon the following grounds:

(a) That under the constitution and by-laws defining and limiting the authority of the international president, the latter "could not legally bind appellant on a contract such as that relied upon by respondent";

(b) That the president of an international labor union "has no general authority sufficiently broad" to enable him to bind such labor union for the payment of compensation for services rendered such president and other high ranking officers of the organization;

(c) That there could be "neither ratification nor estoppel because the Alliance had no knowledge of the transaction . . .";

(d) That the agreement was in parol and void under the statute of frauds. (Civ. Code, § 1624, subd. 1.)

It appears from the record herein that on July 5, 1938, George E. Browne, international president of appellant Alliance, accompanied by his personal representative, William Bioff, interviewed respondent Russell at the latter's office in Los Angeles, at which time said Browne stated that several of the local unions were being investigated by the Treasury Department of the United States and he wanted to engage respondent's services, "to represent the Alliance, any of its unions, or officers and employees, that he might designate in any investigation conducted by the Treasury Department." Respondent, who was the only witness produced at the trial, testified that he "told Mr. Browne that the investigation was not completed, I didn't know what the extent of it would be, it would be hard to foresee how much work would be involved, did not know how long it would last, but I would take it upon the basis of $10,000 for the year 1938, and $10,000 for any year thereafter. Then that for any extraordinary work that I would have to have additional compensation, not being able to tell at that time just how far the investigation would go, how many unions would be investigated, plus any traveling

expenses. I also told him I reserved the right to withdraw from the case at any time I saw fit, because I didn't know what was involved. He said that that was satisfactory to him, that the union wished to likewise reserve the right to dispense with my services at any time they saw fit, and he said upon that basis they would engage my services.'' When questioned respecting the liability of labor unions for income taxes, respondent testified: ''Well, under the law a true labor union was not subject to income tax, but whether it was a labor union within the meaning of the statute or not, would be a question of fact. In many cases rulings were requested as to non-taxable organizations and merely because the Internal Revenue law said that a labor union or a religious organization or a charitable organization was exempt from taxes, as to whether they conformed to the law or not was a matter of fact, and that matter of fact had to be governed by the by-laws of the organization as to whether there was any profit inuring to any private individuals from it. While it is true that the law said that a labor union, likewise a charitable organization, is exempt from taxes, it was a question of fact whether they conformed with the law or not. . . . Q. By Mr. Mahl: Mr. Russell, investigations that were made by the Government in 1939—'38, '39, '40, and '41, were they investigations of the unions? Were they investigations of individuals or were they investigations of the locals and of the Alliance? . . . A. They were investigating the Alliance, they were investigating locals and they were investigating individuals and they never told me why they were doing it. . . . Q. By the Court: With the exception of a very brief period of time during the course of your services, most of it was devoted to the organization as a whole with its affiliated organizations; is that right? A. That is right, and its officers. Q. And its officers? A. The only work that I considered was done personally for Browne and Bioff, I prepared the returns each year, which probably required a day a year apiece. Q. But that wouldn't affect, as far as your services are concerned, the sum of $10,000. You feel that that sum is the reasonable value of your services for the work that you did at the request of the President for and on behalf of the organization as a whole with its affiliated locals, and so forth; is that right? A. Yes, sir. . . . Q. By Mr. Mahl: . . . Have you at any time ever billed any of the officers of the Alliance for service? A. Never. Q. Have you at any time ever received any compensation for any of the officers, individually, of the Alliance? A. No, sir. . . . Q. Now, in con-

nection with the agreement that you had with Browne to represent the Alliance, you specified about the conversation there. How long was that agreement to run? A. No specified time. My understanding was that I could quit the case any time I wanted to and the union could dispense with my services any time they saw fit. Q. Well, was that agreement to be a permanent one subject to those conditions? A. Exactly, because no one knew how long the case would run. It might run until the end of 1938, it might run until the end of 1939. We didn't know. All we knew was that the agents of the Bureau of Internal Revenue were investigating the union's records. . . . Q. By the Court: What was the agreement with respect to the length of time that you were to represent them? A. Your Honor, there was definitely no length of time specified, because it would have been impossible to specify a length of time, because, as I say, the investigation might have ended in '38, or it might have ended in '39, but the agreement was that any additional years that they would employ me would be on the same basis, and it was thoroughly understood that they could dispense with my services at any time.''

In payment for services rendered and disbursements made by him during the years 1938, 1939 and 1940, respondent received six checks totaling $31,180, the first of which was dated July 11, 1938, and the last, June 5, 1940. (Plaintiff's Exhibit No. 10.) These checks were signed by George E. Browne, ''International Pres.'' and were drawn to respondent's order upon ''Special Account'' The Riggs National Bank, Washington, D. C. This special account was created by a resolution (Exhibit No. 13) adopted by the General Executive Board of the Alliance at a meeting held January 11 to 16, 1937, which was approved by the Alliance in convention June 6 to 9, 1938, providing for a levy upon all members of the Alliance of 2 per cent of their weekly wages for the purpose of providing funds ''for the protection of the members of the Alliance . . to protect the Alliance and its members from any eventuality''; and delegated to the International President ''the collection, custody, recording, disbursement and accounting of the fund created by this assessment.''

Appellant concedes, for the purposes of this case, that ''under the broad terms of the two per cent assessment resolution adopted by the General Executive Board and ratified by the Alliance's convention, Browne could do anything he wished

with the funds placed in the 'Special Account', and was not obliged to account to anybody for the disbursement thereof. Had the judgment in the Court below been limited to a claim against the 'Special Account', this appeal would not have been taken." From this it would appear that appellant would not object to the payment for services rendered by respondent in the year 1941 if it could be made from this so-called "Special Account," appellant's main objection being to such payment being made from the general funds of the Alliance. In an attempt to prove that payment from the general fund was contemplated by the Alliance, testimony respecting a conversation between the international president and respondent on May 8, 1940, at a hotel in Chicago, was admitted in evidence over the objection of appellant:

"My conversation with Mr. Browne was about the Internal Revenue investigation of the union, of the Alliance, rather, and the proposed investigation by the Internal Revenue agents in Chicago of several of the locals there, one or two of the locals there, and during the course of the conversation he took a typewritten piece of paper from his pocket and said, 'Mr. Russell, there is the resolution I have had passed by the General Executive Board which would authorize the payment of my (your) fees and the fees of other attorneys, out of the general fund.' He said that if I would be paid out of the general fund, that he thought it would look better, and that was the reason why he had the resolution passed. . . . Q. By Mr. Mahl: And was there additional conversation? A. Yes. He said I would be paid out of the general fund and I said, 'Well now, Mr. Browne, let's have an understanding now, while you are talking about $10,000, I want it clearly understood that for any extraordinary work that I will receive additional compensation.' I said, 'That was the original agreement and I don't want that modified.' He said, 'Yes, I know, Mr. Russell, that is our agreement, and if you perform extraordinary services, you let me know and I will see that you get paid for it.' I said, 'All right.' Q. Did Mr. Browne say anything in addition or in explanation of what he meant by saying that he had had this resolution passed by the General Executive Board because it would look better? Did he explain what he meant by that? A. Well, yes; he said he thought it would look better to the members of the union and the members of his various unions throughout the United States if it was handled in that manner."

The resolution (Plaintiff's Exhibit 12) referred to in the above conversation was adopted by the General Executive Board of the Alliance at a meeting held April 29 and 30, 1940, and approved by the Alliance in convention held from June 3 to 6, 1940, to wit:

"WHEREAS, The interests of the International Alliance may at times be involved in judicial, quasi-judicial, administrative, executive and legislative actions, suits or investigations, civil or criminal, initiated by or against the Alliance or its officers, representatives, agents, employees or affiliates; and

"WHEREAS, The rights, properties and functions of the Alliance may be affected or jeopardized by such proceedings;

"Now, THEREFORE, It is unanimously resolved . . .

"1. The President of the International Alliance is hereby authorized and empowered to take all legal measures which, in the discretion of the said International President, are advisable to protect the rights and interests of the International Alliance in all such proceedings, which are or may be initiated by or against the Alliance or its officers, representatives, agents, employes or affiliates.

"2. The President of the International Alliance is hereby authorized and empowered to use such sums out of the General Fund of the Alliance which, in the discretion of the said International President, shall be advisable for the protection of the interests and rights of the Alliance or its officers, representatives, agents, employes or affiliates in all such proceedings. . . ."

In addition to the special powers conferred upon the president of the Alliance by the two above-mentioned resolutions, broad executive powers were granted to him by various sections of the constitution of the organization in order to carry out the purposes of the Alliance, expressed in section 2 of article one, to wit: "To achieve, by organization and mutual endeavor, the improvement of the social and economic conditions of workers indentified with the theatrical and moving picture industries of the United States and the Dominion of Canada. . . ."

Section 14, article seven of the constitution provides: "The President shall be the executive head of this Alliance and his duties shall be those duties usually devolving upon the International President or executive officer of similar voluntary organizations and his authority shall be that ordinarily conferred upon similar officers having broad executive powers,

and in construing this section it is the desire of the Alliance to insist upon a construction which will support the actions of the International President in carrying out the expressed purposes of the Alliance not only along the lines expressly herein indicated, but in a broad general manner, and the International President shall have and is hereby specifically given the power to issue such rules, regulations, orders or mandates as he may deem necessary or advisable in the conduct of his said office. In addition to the general powers hereby conferred upon the International President, he shall have all special powers conferred upon him by this Constitution and the By-Laws enacted thereunder.''

By section 6, article seven of the constitution, the president is given power to interpret the constitution as to the extent of his own power and ''his decisions thereon shall be binding upon all individual members and affiliated local unions of the Alliance until amended or revised in the manner hereinafter provided.''

By virtue of those sections of the constitution, above quoted, the international president had practically unlimited power and authority as the executive head of the appellant Alliance, and his employment of a tax consultant, at a time when the Alliance was being subjected to investigation by the Internal Revenue Department, was well within the limits of such constitutional power and authority. Further authority for the employment of respondent was vested in the international president by the 2 per cent assessment resolution, adopted by the general executive board in 1937 and approved by the Alliance in convention, by which a special fund was created to be used, by the international president ''to protect the Alliance and its members from any eventuality.''

While not definitely shown by the record herein, it is apparent that the special account created by the 2 per cent assessment of 1937 was in a state of exhaustion early in 1940, when the so-called legal measures resolution was adopted by the general executive board and approved by the Alliance at its convention in June, 1940. If the international president lacked authority to compensate respondent for the services he had already rendered to the Alliance, this latter resolution not only supplied such authority, but constituted a ratification on the part of appellant Alliance of the contract of employment of July 5, 1938. Likewise, such resolution vested in the inter-

national president the power and authority to compensate respondent for services which he rendered subsequent thereto. It is not disputed that respondent fully performed his part of the contract of July 5, 1939, and that he rendered services not only for the years 1938, 1939 and 1940 for which he was paid, but that he rendered services for the year 1941 as well. As the trial court found, at no time throughout this period was objection ever made to respondent's employment by any officer or member of the executive board, nor was his employment ever questioned by any one.

The matters in which respondent was engaged during these years were of vital importance to the members of the Alliance, as well as its officers. As pointed out in respondent's brief, the federal government was making a nationwide investigation as to the income tax liability of appellant and all of its ranking officers. Such investigation was apparently made for the purpose of determining whether the government would make a claim for income tax against appellant for past years. In view of the tremendous income of appellant Alliance, any of such claims would have been large. Considering the period of time consumed and the importance of the matters involved, it cannot well be said at this late date that respondent's employment was unknown to every ranking officer and every member of the executive board, two of whom themselves were being investigated.

An examination of the entire record herein discloses ample evidence of authority on the part of the international president to enter into the contract of employment with respondent and the consequent liability of appellant Alliance to compensate for the services rendered pursuant thereto.

On the question of the statute of frauds, subdivision 1, section 1624 of the Civil Code, provides: ''Contracts that must be written. The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged, or by his agent: 1. An agreement that *by its terms* is not to be performed within a year from the making thereof.'' (Italics added.)

The instant contract entered into on July 5, 1938, contemplated the rendition of services by respondent for the balance of that year, at an agreed compensation of $10,000, payable $5,000 on July 5, 1938, and $5,000 on December 31, 1938. It was further agreed that respondent should receive $10,000

during each calendar year thereafter in which he performed services, but no specific term was agreed upon, it being provided that the contract could be terminated by either party at any time.

"It is clearly the general rule that a contract terminable at the will of either party, in which no definite term longer than a year is agreed upon, is not within the Statute of Frauds." (104 A.L.R. 1007, citing *Mayborne* v. *Citizens National Tr. & Sav. Bank,* 46 Cal.App. 178 [188 P. 1034].) See, also, *Lloyd* v. *Kleefisch,* 48 Cal.App.2d 408, 415 [120 P.2d 97], in which it is stated: "To fall within the condemnation of the statute the contract must be such as to be incapable of performance within one year."

Because of the conclusions reached herein, it is deemed unnecessary to pass upon various other points raised by appellant's brief.

For the reasons stated, the judgment appealed from is affirmed.

Doran, J., and White, J., concurred.