[L. A. No. 19407. In Bank. Dec. 16, 1947.]

CECIL B. DeMILLE, Appellant, v. AMERICAN FEDERA-TION OF RADIO ARTISTS, LOS ANGELES LOCAL (an Unincorporated Association) et al., Respondents.

Neil S. McCarthy for Appellant.

Beilenson & Berger and William Berger for Respondents.

Charles J. Janigian as Amicus Curiae, on behalf of Respondents.

SHENK, J.—This is an appeal by the plaintiff from a judgment dismissing his action following an order sustaining the defendants' demurrer to the complaint without leave to amend.

The record shows the following:

The defendant, American Federation of Radio Artists, herein designated as AFRA or National, is an unincorporated association or union of radio entertainers and performers. It is a component part of the Associated Actors and Artists of America whose jurisdiction is over all performers in the field of entertainment, and an affiliate of the American Federation of Labor. AFRA's jurisdiction is in the field of radio broadcasting and entertainment. It is governed by a National Board, Regional Boards, and Local Boards. It is organized on a union shop basis. It has collective bargaining contracts with all employers of radio artists and performers which provide that only members of the union will be engaged to perform radio services or produce radio programs. Since only members of the union may perform in radio broadcasts, a producer of a radio program is required under his union contract to employ only union members. The union, however, is open to all persons who desire to broadcast, produce programs or perform for radio listeners. An applicant for membership in the union is required to sign an agreement to be bound by the respective constitutions of the National and the Local, the by-laws, rules, regulations and orders existing, and all lawfully adopted amendments.

For more than eight years prior to December, 1944, the plaintiff was engaged in the production of a radio program which was broadcast over the Columbia network. For his services he received $98,200 a year. Since he could not produce the program after the union shop had been effected by AFRA without becoming a member of the union, the plaintiff applied for membership in, and on February 13, 1939, became a member of the defendant AFRA, Los Angeles Local, herein designated as Local. He was a member and was producing his program on December 7, 1944, when the complaint herein was filed.

At the general election of 1944, pursuant to the initiative provisions of the Constitution, Proposition No. 12 entitled "Right of Employment" was submitted to the electors of the state. The adoption thereof would have added the fol-

lowing provisions to article I of the California Constitution:
"Every person has the right to work, and to seek, obtain
and hold employment, without interference with or im-
pairment or abridgment of said right because he does or
does not belong to or pay money to a labor organization."
It purported to make unlawful anything done or threatened
which would interfere or tend to interfere with, impair or
abridge such right; to provide that legal or equitable relief
in a civil action be available, and that the provisions be
self-executing and supersede all provisions in conflict there-
with, except legislation which might be enacted to facilitate,
but not to limit or restrict its operation. As the wording of
the proposed measure indicated, it was designed to prohibit
the union shop in California, and to insure means for effect-
ing the policy of an open shop.

A regular membership meeting of the defendant Local
was held on July 17, 1944. The notice of the meeting con-
tained in the AFRA official bulletin announced that the so-
called Right of Employment measure would be explained
at the meeting. The announcement declared that the meas-
ure, if adopted, would be detrimental to organized labor, and
required educational programs to disseminate information
on the true nature of the proposition. At the membership
meeting a resolution was unanimously adopted authorizing
the board of directors to take any action deemed proper and
necessary to defeat Proposition No. 12. Subsequently the
Central Labor Council of Los Angeles requested from AFRA
Local a contribution of $1.00 per member to a fund to be
used in a campaign of public education by the California
State Federation of Labor to bring about the defeat of the
proposition. The board of directors thereupon on July
21st adopted a resolution levying an assessment of $1.00 per
member, the proceeds to be placed in a separate fund to
be administered by the board in opposing Proposition No. 12.

The AFRA National, in convention at Cleveland, Ohio,
on August 27, 1944, by resolution opposed and condemned
all similar propositions pending in various states, and au-
thorized any and all duly constituted means "to defeat such
anti-labor legislation."

On October 23, 1944, at a regular meeting of the member-
ship of the Local, a resolution was adopted approving an
assessment of $1.00 per member to provide a fund for the
purpose stated, and making the assessment payable with

the current dues. On October 26, 1944, at a regular meeting, the National Board by resolution approved the assessment. The fund thus collected was used solely for the purpose designated.

The Local Board, in meeting, fixed a 30-day delinquency period for payment of the assessment to commence November 1st and directed that all members delinquent in the payment of the assessment be notified. At the board's December meeting it was declared that unless payments were made prior to December 11th, suspension of membership would become automatic. This, of course, was subsequent to the time when it became known that the proposition was defeated at the polls.

The plaintiff received notices of the above membership meetings, and of the assessment. He did not pay the assessment, and received notice of his delinquency and impending automatic suspension. Within four days of the suspension date, he commenced this action for injunctive relief against the National and Local federations, and various executive officers, and obtained an order to show cause and a temporary restraining order. It is assumed that the suspension became effective upon the entry of the order denying further relief and dissolving the temporary restraining order.

Because this court desired to give more extended consideration to the contentions that the actions of the defendants were unauthorized and that they infringed the plaintiff's constitutional rights, the petition for hearing after decision of the District Court of Appeal, Second Appellate District, Division One, affirming the judgment, was granted.

The first contention of the plaintiff to be considered concerns the validity of the conduct of the internal affairs of the defendant federations with respect to the levy of the assessment. He contends that the AFRA had no authority under its organic law and regulations to levy the assessment for the purpose stated, but that if it did, the power was not duly exercised.

The objects and purposes of the organized radio artists and performers are stated in the "Articles of Agreement and Constitution of the American Federation of Radio Artists." Among others, they are, "to protect and secure the rights of the above described persons in their professional activities; to secure proper legislation upon matters affecting their professions; to promulgate and carry into effect such

policies as shall secure the united action of all members of the said professions for the common good; to prevent and abolish abuses from which those coming under the jurisdiction of this Association shall or may suffer; to assist such persons in securing just and equitable contracts, agreements, working conditions and minimum compensation in their dealings with employers, agents, managers, impresarios and others connected directly or indirectly with the radio business; . . . and to take united action to abolish any unfair dealings or abuses or other conditions which are detrimental to persons engaged in the said professions; . . . to combine and co-ordinate the activities of the Association with the activities of other organizations, whenever such combination or coordination shall be to the best interests of the members of the Association. . . .''

The ''Articles of Agreement and Constitution'' of the Local embrace as objectives the purpose to ''secure employment advantages and prevent unfair dealings; the Local to have power to do or cause to be done or to refrain from doing such other acts or things as may be lawfully done or omitted as shall be advantageous during or on account of employment. . . .'' The members of the Local agree also to be bound by the constitution, by-laws and regulations of the National, subject to the constitution, by-laws and rules of the Associated Actors and Artists of America and of the American Federation of Labor.

The foregoing objects and purposes on the part of the National as well as of the Local without question cover authorized and lawful opposition to contemplated legislation which in the opinion of the members of the federation would be inimical to their welfare individually or collectively. Such an association may take measures otherwise legal for its own protection and preservation. (*Parkinson Co.* v. *Bldg. Trades Council,* 154 Cal. 581 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A.N.S. 550]; *Davis* v. *International Alliance etc. Employees,* 60 Cal.App.2d 713, 715 [141 P.2d 486]; *O'Keefe* v. *Local 463 of Assn. of Plumbers,* 277 N.Y. 300 [14 N.E.2d 77, 117 A.L.R. 817].)

The merits or demerits of Proposition No. 12 and the extent to which its adoption would have accomplished the intended purpose are not pertinent to the issues in this case. It is sufficient that the advocates of the open shop considered that labor's program for the union shop had progressed to such a point that a constitutional amendment

was deemed necessary to achieve the aim of the proponents of the measure.

The history and development of the union shop have been set forth in various studies: Rev. Jerome L. Toner, The Closed Shop (American Council on Public Affairs, 1944); Harry Millis and Royal Montgomery, Organized Labor (McGraw Hill & Co., 1945); Samuel Gompers, Annual Report to American Federation of Labor Convention, Pittsburgh, Pennsylvania, November, 1905, and The Union Shop and Its Antithesis (Pub. 1920, American Federation of Labor); Milton Handler, Cases and Materials on Labor Law (West Publ. Co., 1944); Metz, Labor Policy of the Federal Government (The Brookings Institution, Washington, D. C., Banta Publishing Co., (1945). (See, also, U.S. Bureau of Labor Statistics, "Extent of Collective Bargaining at Beginning of 1942," (1942) 54 Monthly Labor Review, 1066, 1069; "Types of Union Recognition in Effect in January, 1943," (1943) 56 Monthly Labor Review 284.)

Beginning with *Parkinson Co.* v. *Bldg. Trades Council* in 1908 (*supra*, 154 Cal. 581), the courts of this state have upheld the union shop as a valid objective of organized labor and have said that compulsion to join a union, brought about by moral force, had not been made contrary to public policy by any statute of this state. To the same effect are *McKay* v. *Retail Automobile Salesmen's Local Union No. 1067*, 16 Cal.2d 311, at page 322 [106 P.2d 373], citing further authorities; and *C. S. Smith Met. Market Co.* v. *Lyons*, 16 Cal.2d 389, 396 [106 P.2d 414]. Section 923 of the Labor Code declaring the public policy as to labor organizations states: "In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment." Similar language appears in section 2 of the Norris-La-Guardia Act (Act of March 23, 1932, c. 90, 47 Stats. 70, 29 U.S.C.A. § 101 et seq.; see, also, § 1 of the National Labor Relations Act, Act of July 5, 1935, c. 372, 49 Stats. 449, 29 U.S.C.A. § 151 et seq., also, as amended by the Labor-Management Relations Act of 1947 (ch. 120, Public Law 101); § 6 of the Clayton Act, act of October 15, 1914, c. 323, 38 Stats. 730.)

Thus it may not be said that the opinion of labor union advocates that legislation such as Proposition No. 12 would be

inimical to the interest of labor was unfounded in the light of the history of the labor movement. Therefore, if the AFRA, through the exercise of its established legislative processes, reached the conclusion that the members collectively should act in any valid way to defeat Proposition No. 12 at the polls, the courts should not say that the objective was outside the purposes of the organization; or that if the expenditure was otherwise lawful the defendants might not expend funds to accomplish their objective. ''An unincorporated association, acting in conformity with the will of the majority of its members, has a right to devote its funds to any purpose calculated to promote the objects of the association.'' (*Myrick* v. *Holmes*, 151 Ga. 437 [107 S.E. 324]; 5 C.J. p. 1344, citing *Parker* v. *Oliver*, 198 Mass. 488 [84 N.E. 860]; *Carter* v. *Strafford Sav. Bank*, 70 N.H. 456 [48 A. 1083]; and other cases.)

The articles of agreement, constitution and by-laws of AFRA, both National and Local, constitute a contract with the members, and are binding on the plaintiff. (*Grand Grove etc. of Druids* v. *Garibaldi Grove*, 130 Cal. 116, 120 [62 P. 486, 80 Am.St.Rep. 80]; *Lawson* v. *Hewell*, 118 Cal. 613, 621 [50 P. 763, 49 L.R.A. 400]; *Harris* v. *Geier*, 112 N.J.Eq. 99, 104-105 [164 A. 50]; *O'Keefe* v. *Local 463 of Assn. of Plumbers, supra*, 277 N.Y. 300, 304; *Cameron* v. *International Alliance etc., Local Union*, 118 N.J.Eq. 11 [176 A. 692, 97 A.L.R. 594]; *Amalgamated Clothing Workers* v. *Kiser*, 174 Va. 229 [6 S.E. 2d 562, 564, 125 A.L.R. 1251].) As that contract may prescribe the terms upon which membership in a union may be gained, so may it define the conditions which will entail its loss. (*Polin* v. *Kaplan*, 257 N.Y. 277 [177 N.E. 833].)

The constitution and by-laws of the Local do not expressly deal with the subject of assessments. But article XI of the constitution of the National treats of initiation fees, dues and assessments. Section 1 of that article provides that initiation fees, dues and assessments of members shall be fixed by the Locals for all members of such Locals, subject to the approval of the National Board. As has been noted, the Local Board, pursuant to authorization by the membership of the Local in meeting, levied an assessment of $1.00 on each member of the Local, for the stated purpose. Subsequently, that action was approved both by the Local membership and by the National Board. The section grants the qualified authority to the Local to fix and levy assessments. Its language does not imply a prohibition upon action first and approval by the National Board afterward. In fact, it infers that the resolu-

tion may come first. The delinquency period which commenced November 1st was fixed by the Local Board after approval by the National Board. Automatic suspension provided in the by-laws was not effective until December 11. But assuming that the applicable section be deemed to require approval by the National Board first and action afterward, the matter may be said to be governed by the rule that subsequent ratification is the equivalent of prior authorization. (*Russell v. International Theatrical etc Employes*, 66 Cal.App.2d 691, 698 [152 P.2d 737]; *O'Keefe v. Local 463 of Assn. of Plumbers, supra*, 277 N.Y. 300, 306-307; *Amalgamated Clothing Workers v. Kiser, supra*, 174 Va. 229 [6 S.E.2d 562, 565, 125 A.L.R. 1251].)

Furthermore, the constitution of the Local provides that all matters or questions relating to the definition, clarification or interpretation of the constitution of any term or provision thereof, or of the by-laws, be determined by the National Board, and that its determination shall be conclusive. On December 11, 1944, the National Board in special meeting approved the assessment procedure followed by the Local as being in conformity with the provisions of the constitution and by-laws of both the National and the Local. ▮ The practical and reasonable construction of the constitution and by-laws of a voluntary organization by its governing board is binding on the membership and will be recognized by the courts. (*Simpson v. Grand International Brotherhood*, 83 W.Va. 355 [98 S.E. 580, 587]; *State ex rel. Smith v. Kanawha County Court*, 78 W.Va. 168 [88 S.E. 662, 664, 20 A.L.R. 1030]; *Harris v. Missouri Pac. R. Co.*, 1 F.Supp. 946, 949; *Shaup v. Grand International Brotherhood*, 223 Ala. 202 [135 So. 327, 328]; *Norfolk & W. Ry. Co. v. Harris*, 260 Ky. 132, 137 [84 S.W.2d 69].) It follows that on this phase of the case the plaintiff was just as much bound by the union organization's constitution and laws as any other of its members, and that thus far he has not presented a case for judicial interference. (See, also, *Smith v. Kern County Medical Assn.*, 19 Cal.2d 263, 270-271 [120 P.2d 874]; *Stein v. Marks*, 44 Misc. 140 [89 N.Y.S. 921, 922-923].)

▮ The plaintiff next contends that the levy of the assessment and the consequent suspension upon his refusal to meet it, infringed his constitutional right of suffrage, freedom of speech, press and assembly. He does not contend that he

was prevented from voting as he pleased at the polls, or from exercising his free choice on the ballot; nor that he was prevented from expressing publicly and privately his personal views in support of Proposition No. 12; nor does he contend that the union engaged in any political activity to put coercion upon him personally to vote in any particular way or to express himself individually as opposing Proposition No. 12. Admittedly, the defendants did not prescribe what should be the members' individual beliefs nor declare that acts or expressions of individual members favorable to Proposition No. 12 would constitute grounds for charges of disloyalty. The plaintiff asserts that, nevertheless, the compulsion by assessment of $1.00 on each member to provide a fund to be used by the union to oppose Proposition No. 12 was a violation of each and all of his stated individual rights.

The ground of the plaintiff's assertion is that his payment of the assessment would be an expression on his part contrary to his personal beliefs. He says: "To compel appellant to put his hand in his pocket and to give money to AFRA leaders to be used to oppose Proposition No. 12 to be voted on at the election of November 7, 1944, when he was unwilling to oppose it and when appellant's sentiments were in favor of Proposition No. 12, compelled appellant to give expression to sentiments and to act contrary to his sentiments and to his thoughts, and . . . to his opinion, . . . . The giving of the money in opposition to appellant's sentiments was more eloquent than the use of actual words." He thereby seeks to draw an analogy to the flag salute cases (*West Virginia State Board of Education* v. *Barnette*, 319 U.S. 624 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674], overruling *Minersville School Dist.* v. *Gobitis*, 310 U.S. 586 [60 S.Ct. 1010, 84 L.Ed. 1375, 127 A.L.R. 1493] ; *Morgan* v. *Civil Service Commission*, 131 N.J.L. 410 [36 A.2d 898] ; *Zavilla* v. *Masse*, 112 Colo. 183 [147 P.2d 823] ; see, also, *Stromberg* v. *California*, 283 U.S. 359 [51 S.Ct. 532, 75 L.Ed. 1117] ), on the theory that if a salute to the flag is a symbol of speech, the payment of the assessment in this case was an equivalent symbol, a confession of belief "more eloquent than the use of actual words." Those cases might be more nearly analogous if the issue involved therein had been that payment of taxes assessed for the support of school districts requiring flag salute ceremonies was a symbol of speech and therefore interfered with constitutional freedoms—in which event we doubt that the disposition would have been the same.

In the flag salute cases, the required ritual was deemed a compulsory personal expression contrary to the tenets of the performer's religious worship, and violated the First and Fourteenth Amendments to the federal Constitution. In making his attempted analogy, the plaintiff assumes that compulsory contribution to the union fund to be used to defeat Proposition No. 12 would be an individual expression of his personal views, i.e., a personal endorsement by him of opposition to Proposition No. 12. His contention further assumes that the use by the Local of the assessment fund to defeat Proposition No. 12 would be a use of the plaintiff's money for that purpose. Neither assumption may properly be indulged.

The member and the association are distinct. The union represents the common or group interests of its members, as distinguished from their personal or private interest. "Structurally and functionally, a labor union is an institution which involves more than the private or personal interests of its members. It represents organized, institutional activity as contrasted with wholly individual activity. This difference is as well defined as that existing between individual members of the union." (*United States* v. *White,* 322 U.S. 694, at page 701 [64 S.Ct. 1248, 88 L.Ed 1542, 152 A.L.R. 1202].) Dues and assessments paid by members to an association become the property of the association and any severable or individual interest therein ceases upon such payment. (*Lawson* v. *Hewell, supra,* 118 Cal. 613, 622; *Rhode* v. *United States,* 34 App.Cas., Dist. of Col. p. 249; *Lamm* v. *Stoen,* 226 Iowa 622 [284 N.W. 465, 121 A.L.R. 627]; *Carpenters Union* v. *Backman,* 160 Ore. 520 [86 P.2d 456]; *Textile Workers Union* v. *Barrett,* 19 R.I. 663 [36 A. 5]; *South Shore Country Club* v. *People,* 228 Ill. 75 [81 N.E. 805, 119 Am.St.Rep. 417, 10 Ann.Cas. 383, 12 L.R.A.N.S. 519]; *Franklin* v. *Burnham,* 40 Misc. 566 [82 N.Y.S. 882].) As such property they are subject to disbursement and expenditure by the association in pursuit of the lawful object or objects for which they were designated to be expended.

It has been seen that union opposition to the adoption of Proposition No. 12 was an object within the sphere of the organic law of the federation and its local. Indeed, the plaintiff does not contend that the union may not thus speak. What he contends is that the union may not use his money for that purpose.

The Local's declaration to pursue the objective and to authorize the raising of a fund for the purpose was expressed by the membership through democratic procedures. It is therefore safe to assume that the Local's action was in accordance with the opinion of the majority of the members of the Local. In no wise may it be said that it necessarily represented the opinion of every individual member thereof, and consequently, that of the plaintiff.

Mere disagreement with the majority does not absolve the dissenting minority from compliance with action of the association taken through authorized union methods. And compliance—here payment by the plaintiff of the assessment—would not stamp his act as a personal endorsement of the declared view of the majority. Majority rule necessarily prevails in all constitutional government including our federal, state, county and municipal bodies, else payment of a tax levied for a duly authorized and proper objective could be avoided by the mere assertion of beliefs and sentiments opposed to the accomplishment thereof. In a government based on democratic principles, the benefit as perceived by the majority prevails. And the individual citizen would raise but a faint cry of invasion of his constitutional rights should he seek to avoid his obligation because of a difference in personal views. A member of a voluntary association should not be permitted successfully to seek a similar avoidance.

The plaintiff states that this is a case of first impression. But the principles involved and applicable to the facts are not new. Here novelty is present only in the assertion that the proper use of association funds may be avoided by a member who is committed to a minority view. Other organizations, such as medical associations, bar associations, and the like, have used their funds to support favorable legislation or defeat measures considered in the opinion of the majority or its duly authorized representatives to be inimical to the public interest or to its own welfare. It has never been considered that a difference of opinion within the association as to the use of association funds for such purposes, where otherwise lawful, was a matter for judicial interference.

The plaintiff invokes sections 11580 and 11582 of the Elections Code. Those sections make intimidation of voters a criminal offense. But he does not contend that he suffered any threat, coercion, duress, force, abduction, fraud, menace, bribery, or attempted intimidation in the exercise of his

choice at the polls. He invokes the sections as indicating an intimidation upon him in the exercise of the right of suffrage because of an asserted invasion of his freedom of thought or speech regarding his personal views. Since, however, he asserts no interference or intimidation upon him by threat, menace, force, or other interference with his exercise of his choice at the ballot, and since he had and continued to have absolute freedom to think or announce what views he pleased, the concept is untenable. The sections contemplate restraints on the use of corrupt means of influencing voters. Obviously, there was no unlawful influence brought to bear on the plaintiff in the absence of a requirement for his personal endorsement of the defeat of Proposition No. 12. No such endorsement was asked. All that was sought was a contribution by assessment to provide funds to enable the union to pursue one of its lawful objectives.

Cases relied on by the plaintiff are consistent with the foregoing conclusions. He quotes the following from *Amalgamated Society of Railway Servants* v. *Osborne,* 1 British Ruling Cases 56, at 94 (1909, 1 Law Re. Ch. Div. 163, at 195) : ''It is not enough to say that a man's vote has not been influenced. It is also necessary for his freedom that he shall not have been coerced into supporting by money or otherwise the candidate whom he wishes to oppose. It is really ludicrous to suggest that his choice is confined to voting on the day of the poll. . . . Unless freedom of choice is to be reduced to an absurdity, it must extend to the whole conduct of the elector towards the candidate from beginning to end.'' In that case the court condemned as illegal and unauthorized under the English Trade Union Acts an objective of a union to provide a fund for the election and maintenance of parliamentary representation, candidates for which should ''sign and accept the conditions of the Labour Party and be subject to their whip.'' A double aspect of the case was the inhibition upon parliamentary conduct of an elected representative, and the coercion by demands for political and financial support at the expense of expulsion upon members of the trade union who might be opposed to the Labour Party candidate. The general language in the various opinions in that report must be deemed to have been confined to the point at issue, that is, the validity of the coercion upon members for their political and financial sup-

port of candidates for election who would be favorable to labor, an object clearly opposed to the public interest and which legislatures in this country have sought to control by the enactment of corrupt practices acts. An inference may not be drawn from that report to the effect that in England the courts would condemn the use of union funds derived from an assessment for the purpose of conducting educational programs and public debate on legislative matters touching labor interests. In fact, in *Linaker* v. *Pilcher* (1901), 70 L.J., K.B. 396, 87 L.T. 421, it was held that financial support of a newspaper was within the lawful objects of the union. The opinion states at page 426 of 87 Law Times Reports that the enterprise was within the lawful objects of the society to improve the condition and protect the interests of its members because the newspaper was published entirely in the interests of the members of the trade union and to protect their interests. The Osborne case may not be deemed authority for the condemnation of the use of union funds in any and every political campaign. The purposes and objects of the Trade Union Acts, together with the declared public policy that a union, as any other organization, may not campaign to elect and support a representative in Parliament required to be favorable to its interests, determined the issues in that case. The decision does not indicate that the English court would have deprived the trade union of any valid means at its command to protect the collective interests of its members.

The Osborne case is consistent with an affirmance of the judgment in the present case, as are also other cases cited by the plaintiff in support of general principles relied on by him but which do not control the decision in this case. Some of those cases are:

*Schneider* v. *State,* 308 U.S. 147 [60 S.Ct. 146, 84 L.Ed. 155], and *Ex Parte Winnett,* 73 Okla.Cr. 332 [121 P.2d 312] (two of the Jehovah's Witnesses cases); *Communist Party* v. *Peek,* 20 Cal.2d 536 [127 P.2d 889] (involving the word "communist" in party designation); *Commonwealth* v. *Antico,* 146 Pa.Super.Ct. 293 [22 A.2d 204] (conspiracy to violate election laws); *Lockheed Aircraft Corp.* v. *Superior Court,* 67 A.C.A. 205 (28 Cal.2d 481 [171 P.2d 21, 166 A.L.R. 701], wrongful discharge of employees); *State* v. *Kohler,* 200 Wis. 518 [228 N.W. 895, 69 A.L.R. 348] (validity of an election of a condidate for governor); *Neelley* v. *Farr,* 61 Colo. 485 [158 P. 458, Ann.Cas. 1918A 23] (election contests);

*United States* v. *United States Brewers' Assn.,* 239 F. 163, and *Egan* v. *United States,* 137 F.2d 369 (involving violations of certain corrupt practices acts); *Stein* v. *Marks, supra,* 44 Misc. 140 [89 N.Y.S. 921] (unlawful pledge of political support by a nonpolitical organization); *Vulcan Last Co.* v. *State,* 194 Wis. 636 [217 N.W. 412] (unlawful attempt to influence votes of employees); *Ex parte Yarbrough,* 110 U.S. 651 [4 S.Ct. 152, 28 L.Ed. 274] (intimidation of and assault on Negro voters in a congressional election); *Spayd* v. *Ringing Rock Lodge No. 665, Brotherhood of Railroad Trainmen,* 270 Pa. 67 [113 A. 70, 14 A.L.R. 1443] (unlawful by-law of a mutual benefit society providing for expulsion of members who engage in antagonistic political activity); *Thornhill* v. *Alabama,* 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed 1093] (state prohibition against picketing; see, also, *A. F. of L.* v. *Swing,* 312 U.S. 321 [61 S.Ct. 568, 85 L.Ed. 855]; *Carpenters & Joiners Union* v. *Ritter's Cafe,* 315 U.S. 722 [62 S.Ct. 807, 86 L.Ed. 1143]; *Ellis* v. *Journeyman Barbers' Int. Union,* 194 Iowa 1179 [191 N.W. 111, 32 A.L.R. 756]); *Collins* v. *International Alliance of T. S. E.,* 119 N.J.Eq. 230 [182 A. 37], and *Cameron* v. *International Alliance etc. Local Union, supra,* 118 N.J.Eq. 11 [176 A. 692, 97 A.L.R. 594] (union discrimination between senior and junior members); *James* v. *Marinship Corp.,* 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900] (union discrimination against Negroes); *Bautista* v. *Jones,* 25 Cal.2d 746 [155 P.2d 343] (discrimination restricting membership in union).

In his reliance on the foregoing and other similarly distinguishable cases, the plaintiff has assumed that the union's action in levying an assessment for the purpose stated was some sort of compulsion upon him to adopt the union view of what was best for union interests, and that payment thereof would be an expression on his part of the union belief. As has been seen the assumption is not warranted by the facts.

█ The plaintiff contends that the action of the union has deprived him of his right to work. The right to earn a living is deemed to be property within the concept of the Fifth Amendment to the federal Constitution, and a union, in the service of its interest, may not deprive a person of his constitutional rights of liberty and property. (*Cameron* v. *International Alliance etc., Local Union, supra,* 118 N.J. Eq. 11 [176 A. 692, 697, 700, 97 A.L.R. 594].) Consequently, it has been held that membership in a union is a property

right which the courts will protect. (*Lo Bianco* v. *Cushing*, 117 N.J.Eq. 593 [177 A. 102]; *Dusing* v. *Nuzzo*, Supreme Court of N.Y., 177 Misc. 35 [29 N.Y.S.2d 882].) It is insisted that to decline to belong to a union and to continue to work as a nonmember is a right equally protected by the Constitution. The position of the plaintiff is somewhat reflected in recent federal legislation relating to the closed shop (see Labor-Management Relations Act of 1947, ch. 120, Pub.Law 101). It was the judicial declarations in this state approving the union shop as a valid labor objective that undoubtedly inspired the advocacy of Proposition No. 12 as a measure to reestablish what the plaintiff conceived to be his constitutional right. His arguments favor the adoption of such a measure as Proposition No. 12 as a statement of state policy, or the overruling of the cases in this state approving the union shop objective. Unfortunately for his position, there seems to be little likelihood of the latter, and relief for him and others like-minded through state legislative processes, at least for the time being, was foreclosed by the rejection of the measure at the polls. If the Congress in 1947, within its legislative sphere, outlawed the closed shop that fact could not, in any view, apply to transactions in 1944.

The plaintiff contends that the assessment was a "tax" on his right to work. If that be so, then also are union dues such a tax. Whether denominated a charge or a tax the plaintiff, when he became a member, agreed to pay his share of the support of the union by discharging his obligation to pay dues and assessments. It is not contended that refusal to pay dues would be other than the equivalent of a voluntary withdrawal from the union. Refusal to pay a reasonable assessment for a lawful union object, where otherwise valid, has no greater significance.

Automatic suspension pursuant to the by-laws following the failure to pay union dues does not contravene the requirements of due process. No distinction may properly be made between an organization on a union shop basis and any other lawfully recognized organization. The plaintiff voluntarily chose not to pay a lawful union assessment. Automatic suspension was the consequence of his own choice. In *Tinker* v. *Modern Brotherhood of America*, 13 F.2d 130, 132, the court upheld automatic termination of membership for nonpayment of tax and dues as a voluntary relinquishment, saying that the plaintiff "had the right of terminating

his contractual relations and obligations to the society by the mere nonpayment of his dues.''

Such a provision for automatic suspension upon failure to pay dues, a tax, or an assessment, is distinguished from a provision for suspension or expulsion based on charges of misconduct or the like, in which latter case notice and hearing on the preferred charges are considered mandatory, and their omission to constitute a noncompliance with the requirements of due process. (*Grand Grove A. O. of D.* v. *Garibaldi Grove,* 105 Cal. 219, 224 [38 P. 947] ; *Grand Grove etc. of Druids* v. *Garibaldi·Grove, supra,* 130 Cal. 116, 120; *Supreme Lodge of the World* v. *Los Angeles Lodge No. 386,* 177 Cal. 132 [169 P. 1040] ; *Taboada* v. *Sociedad Espanola,* 191 Cal. 187 [215 P. 673, 27 A.L.R. 1508] ; *Lo Bianco* v. *Cushing, supra,* 117 N.J.Eq. 593 [177 A. 102] ; *Polin* v. *Kaplan, supra,* 257 N.Y. 277.)

There was thus no invasion of any constitutional right of the plaintiff. His membership in the union was suspended. This followed automatically his voluntary choice of action. By his own choice and act he likewise may terminate that suspension. He possessed and, it is assumed, still possesses the means of affording his own relief.

It follows that no ground for reversal is presented unless it appear that the union's money contribution to the defeat of Proposition No. 12 was contrary to the Federal Corrupt Practices Act, 2 United States Code Annotated, section 241 et seq. It may be assumed that the assessment and consequent suspension of the plaintiff for failure to pay it would be void if the use of the proceeds of the assessment in contributing to the defeat of Proposition No. 12 were contrary to that act. Section 251, originally applicable to corporations and amended in 1943 to apply also to labor unions (2 U.S.C.A. 251, as amended June 25, 1943, ch. 144 § 9, 57 Stats. 167), provides in part:

''It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution in connection with any election to any political officer, or for any corporation whatever, or any labor organization to make a contribution in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or for any candidate, political committee, or other person to accept or receive any

contribution prohibited by this section." The section also contains punitive provisions.

A reading of the foregoing language indicates that the Congress thereby extended its regulatory processes only to (1) banks and corporations organized under federal laws in respect to any political office (necessarily including state, municipal, county, etc., offices); and to (2) any corporation or labor organization in respect to federal elective office. Therefore, insofar as state activities are concerned, the Congress appears to have covered federal corporations in respect to political office in the state; and state corporations and labor organizations in connection with election to federal office. Obviously, the Congress did not purport to cover state corporations and labor organizations in respect to state activities. There also appears a distinction between the political and legislative functions of the electorate, by failure to mention the legislative function. The language does not express an intent to include within the scope of regulation state legislative matters appearing on the ballot; and the inclusion of matters of such doubtful permissible federal regulation will not be implied. Penal statutes will not be given application beyond their plain intent. Such acts include only those offenses coming clearly within the import of the language. (*State* v. *Terre Haute Brewing Co.*, 186 Ind. 248 [115 N.E. 772]; *United States* v. *Brewer*, 139 U.S. 278 [11 S.Ct. 538, 35 L.Ed. 190]; *United States* v. *Gradwell*, 243 U.S. 476 [37 S.Ct. 407, 61 L.Ed. 857]; *Newberry* v. *United States*, 256 U.S. 232 [41 S.Ct. 469, 65 L.Ed. 913]; *La Belle* v. *Hennepin County Bar Assn.*, 206 Minn. 290 [288 N.W. 788, 125 A.L.R. 1023].) In *State* v. *Kohler*, *supra*, 200 Wis. 518 [228 N.W. 895, 69 A.L.R. 348], in regard to a state corrupt practices act, it was said that the circulation of pamphlets, the writing of letters, or the discussion in other proper ways of questions relating to public affairs which do not have for their immediate objective the promotion of the candidacy of a particular person, could not be said to be done for political purposes as that term was used.

Our conclusion in this respect renders it unnecessary to determine whether the union's use of the funds in the manner involved constituted a "contribution" or something else; or to dwell upon the question whether the act, if it extended to the activities held to be excluded, would be violative of the First Amendment to the United States Constitution pro-

hibiting enactment by Congress of laws abridging the freedoms of speech, press, or assembly.

The foregoing sufficiently disposes of the contentions of the plaintiff.

The judgment is affirmed.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.