Opinion
 

 RATTIGAN, J.
 

 California State University, Hayward (CSUH) has been a member of the National Collegiate Athletic Association (NCAA) for several years. In 1970 and 1971, CSUH permitted two students to represent it in intercollegiate athletic competition. The NCAA took exception and imposed a penalty upon CSUH. Several years and two appeals later, the consequences are still in litigation.
 

 CSUH commenced the litigation to enjoin the NCAA from enforcing the penalty. The superior court initially granted a preliminary injunction. On appeal by the NCAA, the order granting the preliminary injunction was affirmed.
 
 (California State University, Hayward
 
 v.
 
 National Collegiate Athletic Assn.
 
 (1975) 47 Cal.App.3d 533 [121 Cal.Rptr. 85].) After a subsequent trial on the merits of the action, the superior court found in favor of CSUH and entered a judgment granting it a permanent injunction. The NCAA appealed again, this time from the judgment.
 

 Although some of the material facts are stated in the previous decision as they had been pleaded (47 Cal.App.3d 533 at pp. 537-539), they should be restated as established at the trial. The trial court found, or the evidence otherwise supports recitals, as follows:
 

 CSUH is a member institution of the California State University and Colleges system. The NCAA is a voluntary unincorporated association of some 700 colleges and universities in the United States. It supervises and coordinates intercollegiate competition in seasonal sports, and directly sponsors certain post-season athletic events in which its members compete on a selective basis.
 

 CSUH has been an “active” member of the NCAA since 1962. An “active” member is a four-year college or university. An “allied” member is an athletic conference or association composed of active members. The Far Western Conference (FWC) is a voluntary unincorporated association of California colleges and universities which sponsors and coordi
 
 *466
 
 nates athletic competition among them on a regional basis. The FWC is an “allied” member of the NCAA. CSUH is a member of the FWC.
 

 The NCAA functions pursuant to a constitution and bylaws. The FWC has its own constitution. As pertinent to this case, the eligibility of students to participate in intercollegiate athletic competition is covered in two provisions of the NCAA constitution which generally defer control of the subject to its members.
 
 [1]
 
 Article VI, section 3(e), of the FWC constitution covers the subject in more specific terms as to freshman students only.
 
 [2]
 
 The FWC provision is a variation of language which the NCAA amended into article
 
 4
 
 of its bylaws (bylaw 4) in 1965, effective in 1966. The language became known as the “1.6 rule” because of its reference to a freshman student’s “predicted” grade point average (GPA) at that figure.
 
 [3]
 

 The 1.6 rule caused confusion and differing interpretations among NCAA members. Some of them interpreted it to apply to post-season
 
 *467
 
 athletic competition only, to permit a student’s eligibility for in-season play to be regulated by the conference to which his college or university belonged, and to permit a freshman “sub-predictor” (see fn. 3,
 
 ante)
 
 to be eligible for in-season competition so long as he was not allowed to participate in post-season events. The FWC shared this interpretation, which was reflected in article VI, section 3(e), of its constitution. (See fn. 2 and the accompanying text,
 
 ante.)
 

 Everett Shelton was the commissioner of the FWC, and Arthur Bergstrom was the assistant executive director of the NCAA, at pertinent times. In a letter written to Bergstrom on October 21, 1969, Shelton noted his impression that the rules of “small” athletic conferences frequently deviated from those of the NCAA. He further stated: “. . . This December [1969] meeting we [the FWC] are going to tiy to get the whole thing straightened out. ... I want to know if you can use an ineligible player and qualify for a Post-Season game and then drop him for that game. . . .”
 

 Shelton’s letter made no reference to the NCAA constitution or bylaws. In a reply written on October 30, 1969 (the Bergstrom letter), Bergstrom answered Shelton’s inquiry in affirmative
 
 [4]
 
 At that time, the FWC did not change the student eligibility standards prescribed in its constitution. (See fn. 2 and the accompanying text,
 
 ante.)
 
 The contents of the Bergstrom letter were made known to CSUH.
 

 Ronald McFadden was admitted to CSUH, as a freshman, in the fall of 1969. Melvin Yearby was admitted as a freshman in the fall of 1970. Upon entrance, each was a “sub-predictor” for purposes of the 1.6 rule. (See fn. 3,
 
 ante.)
 
 Each nevertheless achieved a GPA of more than 2.0 by
 
 *468
 
 the midpoint of his freshman year. CSUH accordingly permitted McFadden to represent it in some intercollegiate track meets during the 1970 season, and Yearby to play on its baseball team in some intercollegiate games in the 1971 season, while each was in the after part of his respective freshman year. In each instance, CSUH acted with knowledge of the FWC’s current student eligibility standards (see fn. 2) and of the Bergstrom letter (fn. 4).
 

 At some point not shown in the record, the NCAA published an “Official Interpretation” (O.I. 418) which imported that the 1.6 rule made a sub-predictor
 
 student
 
 ineligible to compete in intercollegiate athletics.
 
 [5]
 
 Bergstrom testified that he orally interpreted the rule to this effect in a conversation with James L. Comer, the CSUH athletic director, prior to June 3, 1970. Bergstrom expressed the same interpretation in a letter he wrote Shelton (but not CSUH) on that date. This letter quoted Comer as having “reported” that the FWC permitted freshman sub-predictors to play in “regular, inseason competition.” It also informed Shelton that such practice would constitute a “violation” of the 1.6 rule, but it did
 
 not
 
 state that Bergstrom had told Comer this. Neither Comer nor Shelton testified at the trial.
 

 At a meeting conducted later in 1970, after Shelton had heard from Bergstrom as just described, the faculty board of the FWC amended section 3(e) of article VI of the FWC constitution. (See fn. 2,
 
 ante.)
 
 The minutes of the meeting are apparently the only evidence of this amendment. They do not show the amended language, but they state that it was adopted “to satisfy NCAA requirements.” They also show that the amendment did not take effect until the fall of 1971, which was after both McFadden and Yearby had been permitted to compete for CSUH during their respective freshman years. CSUH was unaware of an eligibility problem, with regard to either student, until after the NCAA had published a memorandum concerning the 1.6 rule in February 1972.
 

 
 *469
 
 The NCAA was subsequently informed that McFadden and Yearby had competed for CSUH while they were sub-predictor freshmen. In November 1972, it demanded that CSUH declare both young men
 
 currently
 
 ineligible, for one year, pursuant to “the provisions of Official Interpretation 418” (see fn. 5, ante) and subject to an appeal by CSUH for restoration of their eligibility. CSUH at first declared the two ineligible and took the appeal, which was denied by an NCAA subcommittee.
 

 CSUH then took a further appeal to the NCAA Council (the association’s body of last resort), but declared McFadden and Yearby to be eligible while the appeal was pending. The latter action was taken upon the stated grounds that McFadden would otherwise lose eligibility during the track season of his senior year and that it would be “unjust” to impose current ineligibility on either student. The council denied the appeal in May of 1973.
 

 An NCAA official had meanwhile treated the two students’ continuing eligibility as a further violation of “the requirements of NCAA legislation” and reported CSUH to the committee on infractions. In December of 1973, after a hearing, that committee produced a report in which it (1) made a finding that McFadden and Yearby had played “while ineligible” under the 1.6 rule; (2) made further findings to the effect that CSUH had defied the NCAA by declining to comply with its decisions regarding the two students’ eligibility in and after 1972; and (3) proposed a penalty whereby CSUH would be “publicly reprimanded and censured, and placed on probation for an indefinite period” (but for not less than two years) during which it would not be permitted to participate in NCAA “championship” or other post-season events.
 

 CSUH did not challenge the committee’s findings, but appealed the major parts of the “proposed penalties” to the NCAA Council. After another hearing, the council denied this appeal in January of 1974.
 

 At every stage of these various proceedings, CSUH admitted the essential facts but stressed its reliance upon the Bergstrom letter and the former FWC eligibility rules as the bases for having permitted McFadden and Yearby to compete in 1970 and 1971. None of the several NCAA bodies mentioned either factor in its decision. Throughout the proceedings, it was made clear that the exclusive or principal reason for the penalty was the refusal of CSUH to declare McFadden and Yearby
 
 *470
 
 ineligible upon demand. At the final hearing before the council, this position was characterized as “sheer defiance of NCAA rules.”
 

 The probation penalty took effect when the council denied the final appeal in January 1974.
 
 [6]
 
 CSUH commenced this action about two months later.
 

 After submission of the cause upon the foregoing evidence, the trial court filed a memorandum decision in which it (1) rejected CSUH’s argument that the suspension imposed by the NCAA “was a penalty which exceeded the authority granted it by O.I. 418”; (2) expressed the determination that the NCAA was “estopped” from imposing the penalty by reason of the Bergstrom letter and CSUH’s reasonable reliance upon it; (3) stated that it declined to consider whether the NCAA’s demand pursuant to O.I. 418 had been “violative” of state or federal law; and (4) ordered the issuance of a permanent injunction as prayed.
 

 At the NCAA’s request, the court made formal findings of fact which covered most of the evidence summarized above. Some of the findings, and other evidentiary points, are specifically mentioned below. As conclusions of law, the court said: “I. Petitioners have exhausted their administrative remedies. II. CSUH’s conduct was reasonable and proper in light of the above facts and equity. III. NCAA is estopped by it's conduct from imposing any sanction whatsoever arising out of or a part of the events, transactions and facts of this case.”
 

 
 *471
 
 Consistent with the position taken by the court in its memorandum decision, the findings and conclusions do not mention whether NCAA’s actions had violated state or federal law in any respect. They also failed to mention whether the NCAA had followed its constitution and bylaws.
 

 On appeal from the judgment granting a permanent injunction, the NCAA first contends that the trial court “exceeded the permissible scope of judicial review of a private voluntary association’s action.”
 
 [7]
 
 The court expressly found, and it is undisputed, that when CSUH became a member of the NCAA it “agreed to comply with all the requirements of the NCAA constitution and bylaws.” The finding expresses the fact that the relationship between the parties was one of
 
 contract,
 
 between the NCAA as a voluntary association and CSUH as a member, evidenced by the constitution and bylaws.
 
 (Lawson
 
 v.
 
 Hewell
 
 (1897) 118 Cal. 613, 618-619, 621 [50 P. 763];
 
 DeMille
 
 v.
 
 American Fed. of Radio Artists
 
 (1947) 31 Cal.2d 139, 146 [187 P.2d 769, 175 A.L.R. 382];
 
 Sevey
 
 v.
 
 American Federation of State etc. Employees
 
 (1975) 48 Cal.App.3d 64, 69 [121 Cal.Rptr. 341].)
 

 The language of the constitution providing for discipline of a member (see fn. 6,
 
 ante)
 
 thus permits the NCAA to impose a penalty for the member’s breach of the underlying contract. If CSUH breached it as the NCAA contended, the penalty was properly imposed pursuant to the contract. If not, the action imposing it was taken by the NCAA in violation of the contract: i.e., of its constitution and bylaws. Courts will intervene in the internal affairs of a private voluntary association to nullify substantial disciplinary action taken against a member in violation of its constitution and bylaws.
 
 (California State University, Hayward
 
 v.
 
 National Collegiate Athletic Assn., supra,
 
 47 Cal.App.3d 533 at pp. 539-540, 542-543 and cases cited.) The trial evidence established—as CSUH’s complaint had portended—that the effect of the suspension upon the university, its athletic program and its reputation was sufficiently substantial to warrant judicial intervention here. (See
 
 id.,
 
 at pp. 540-542. See also fn. 6,
 
 ante.)
 

 The NCAA also asserts that judicial intervention should have been denied because CSUH appealed only the penalty to the council and did
 
 *472
 
 not challenge the findings of the Committee on Infractions. This is in effect an argument that CSUH failed to exhaust the internal administrative remedy which was available to it as a member of the NCAA. The exhaustion doctrine applies within a voluntary association
 
 (Westlake Community Hosp.
 
 v.
 
 Superior Court
 
 (1976) 17 Cal.3d 465, 474-475 [131 Cal.Rptr. 90, 551 P.2d 410]), but its purpose is to permit the association “. . . quickly to determine through the operation of its internal procedures that it has committed error . . . .”
 
 (Id.,
 
 at p. 476.) The internal appeals successively taken by CSUH presented all the circumstances of its reliance upon the Bergstrom letter, and afforded the NCAA full “opportunity” to review the merits of its proposed disciplinary action in light of that fact. The purpose of the exhaustion doctrine having thus been served, it will not be applied to bar a remedy to CSUH.
 

 Once the trial court had undertaken to intervene, the question presented was whether the NCAA had been entitled to penalize CSUH for the latter’s breach of their contract. The NCAA’s right to do this arose under the same contract. The doctrine of equitable estoppel may be applied to prevent a person from asserting a right which has come into existence by contract.
 
 (Brown
 
 v.
 
 Brown
 
 (1969) 274 Cal.App.2d 178, 188 [79 Cal.Rptr. 257].) CSUH squarely asserted the doctrine in the second cause of action stated in its complaint. The trial court was therefore warranted in applying the doctrine if the evidence established the existence of its requisite elements.
 

 “ ‘Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.’ ”
 
 (City of Long Beach
 
 v.
 
 Mansell
 
 (1970) 3 Cal.3d 462, 489 [91 Cal.Rptr. 23, 476 P.2d 423] [quoting
 
 Driscoll
 
 v.
 
 City of Los Angeles
 
 (1967) 67 Cal.2d 297, 305 (61 Cal.Rptr. 661, 431 P.2d 245)].)
 

 The trial court made findings which explicitly or in substance established the existence of the first, third and fourth elements, and the alternative factor of the second. The NCAA does not challenge the language of these findings, or their adequacy to support the court’s
 
 *473
 
 application of the estoppel doctrine, but contends that the evidence is insufficient to support them. This contention rests in part upon Bergstrom’s uncorroborated testimony that he gave a correct oral interpretation of the 1.6 rule to Comer before Yearby was permitted to play baseball in 1971. The contention is also addressed to the trial court’s interpretation of the Bergstrom letter, of the evidence of various persons’ conduct before and after it was written, and of the trial testimony of some of them.
 

 The first point involves the assessment of Bergstrom’s credibility as a witness, which was within the exclusive province of the trial court.
 
 (Nestle
 
 v.
 
 City of Santa Monica
 
 (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480].) The others challenge findings made from evidence which was in conflict, or which would support opposing inferences, and some of which pertained to the Bergstrom letter as extrinsic evidence bearing upon its interpretation. These findings are to be sustained on appeal if there is any substantial evidence supporting them.
 
 (Foreman & Clark Corp.
 
 v.
 
 Fallon
 
 (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362];
 
 Parsons
 
 v.
 
 Bristol Development Co.
 
 (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) We need not detail the evidence beyond the summary which appears above; it suffices to state that we find substantial evidence in support of the findings relative to the elements of equitable estoppel.
 
 (City of Long Beach
 
 v.
 
 Mansell, supra,
 
 3 Cal.3d 462 at p. 489.) It is also apparent that the trial court perceived the real equities when it made these findings. (See, e.g., fn. 6,
 
 ante.)
 
 There is no occasion to disturb them.
 

 The NCAA contends that the court erred in several instances where it sustained objections to evidence. The evidence thereby excluded was not relevant; no error appears. The judgment is accordingly to be affirmed upon the basis that the NCAA is estopped from imposing the penalty. Because the trial court terminated its inquiry when it reached the estoppel point, it did not address the question whether the NCAA had complied with its constitution and bylaws in imposing the penalty. Having examined those sources (which we have quoted at length for the purpose), we conclude that it did not. We affirm the judgment upon that alternate ground of decision, as next discussed.
 

 The eligibility of a “student-athlete” to represent an NCAA “institution” in intercollegiate athletic competition is governed by section
 
 *474
 
 3 of article III of the 1969 NCAA constitution, which provides in effect that a student is eligible if regularly admitted, in good academic standing, and pursuing a course of study toward a degree. (See fn. 1,
 
 ante.)
 
 McFadden and Yearby met these requirements when they were freshmen at CSUH. Section 2 of article 3 vested the “control and responsibility for the conduct of intercollegiate athletics” in CSUH and in the FWC. (See
 
 ibid.)
 
 McFadden and Yearby met the FWC’s eligibility requirements according to its standards when they competed for CSUH as freshmen. (See fn. 2.) They were therefore eligible in their freshman years, sub-predictors or not, within the explicit meaning of section 3 and consistent with section 2.
 

 The fact that they were sub-predictors invoked the 1.6 rule stated in section 6(b) of NCAA bylaw 4. That rule, however, did not make either of them ineligible during their respective freshman years: it provided only that
 
 CSUH,
 
 as an “institution,” would be ineligible to participate “in an NCAA-sponsored event” (meaning a post-season championship event)
 
 if il
 
 did not declare them ineligible pursuant to the authority vested in it by section 2 of article III of the constitution. (See fn. 3,
 
 ante.)
 
 Exercising that authority to the contrary, CSUH treated both young men as eligible. It thereby incurred the automatic consequences of the rule, as applied to it (CSUH) alone, but it did not field athletes who were “ineligible.”
 

 The only basis for the assertion that McFadden and Yearby
 
 had been
 
 ineligible, when they competed as sub-predictors, is O.I. 418 (quoted in fn. 5,
 
 ante).
 
 O.I. 418 calls for the imposition of a penalty upon a student-athlete to whom it refers as having practiced or competed “while ineligible” under the 1.6 rule. It thus assumes that sub-predictors are or were “ineligible,” but it does not say so. If it produced that effect by implication when the NCAA membership ratified it in 1972 (see fn. 5,
 
 ante),
 
 it did not retroact to make McFadden and Yearby ineligible when they competed before that. No provision of the constitution or bylaws had that effect when they competed. Absent any such effect from a valid and contemporaneous source, O.I. 418 is simply wrong to the extent that it purports to declare that a sub-predictor is or was “ineligible” to compete.
 

 These interpretations of the 1.6 rule and O.I. 418 are not at variance with those reached in the two federal appellate decisions which have considered one or both. One of the decisions, which involves the 1.6 rule only, supports our conclusion that it pertains to the eligibility of
 
 institutions
 
 for post-season NCAA competition but not of
 
 students
 
 
 *475
 
 competing in season.
 
 (Parish
 
 v.
 
 National Collegiate Athletic Association
 
 (5th Cir. 1975) 506 F.2d 1028, 1030-1031 [text and fn. 3].)
 

 The other decision treated O.I. 418 as an authoritative declaration that sub-predictors were ineligible under the 1.6 rule, but only because it and other “official interpretations” were “binding” upon NCAA members, when published, pursuant to an explicit provision (“Article Six, § 2”) of the
 
 1972
 
 NCAA constitution.
 
 (Associated Students, Inc., Etc.
 
 v.
 
 National Col. Ath. Assn.
 
 (9th Cir 1974) 493 F.2d 1251, 1253.) The decision is wholly distinguishable because no such provision appears in the
 
 1969
 
 constitution which controls the present case. (See fn. 5,
 
 ante.)
 
 Lacking it as a valid source, O.I. 418 was no more than a unilateral misinterpretation of the 1.6 rule which did not reach McFadden or Yearby.
 

 Since both students were eligible by NCAA standards when they competed for CSUH, and O.I. 418 did not change their status, CSUH did not violate any NCAA rule by permitting them to compete. It follows that the NCAA is itself in violation of its constitution and bylaws by imposing a penalty for the asserted breach of O.I. 418 or any other rule. Judicial intervention is warranted on this independent basis.
 
 (California State University, Hayward
 
 v.
 
 National Collegiate Athletic Assn., supra,
 
 47 Cal.App.3d 533 at pp. 539-540, 542-543 and cases there cited.)
 

 CSUH argued this ground for affirmance in its reply brief. The NCAA replied that the ground was unavailable because it was not supported by factual findings. However, the pertinent provisions of the NCAA constitution and bylaws, and O.I. 418, are subject to interpretation as they read; there is no extrinsic evidence, attending the enactment or promulgation of any of them, which bears upon their construction. For these reasons, their interpretation is “solely a judicial function” which this court must independently perform on the appeal.
 
 (Parsons
 
 v.
 
 Bristol Development Co., supra,
 
 62 Cal.2d 861 at pp. 865-866.) It therefore produces a conclusion of law which is not to be expressed in a finding of fact. Having reached it as an alternative ground for affirming the judgment, we need not write it into the conclusions of law reached below: the judgment itself reflects it. (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 304, p. 3113.)
 

 Other points raised in the briefs need not be discussed.
 

 
 *476
 
 The purported appeal from the order denying a motion for a new trial is dismissed. The judgment is affirmed.
 

 Caldecott, P. J., and Wilson, J.,
 
 *
 
 concurred.
 

 [1]
 

 The trial court received in evidence an NCAA constitution and bylaws which were dated “1969” and were in effect during that year and at pertinent times thereafter. The provisions of the 1969 constitution here cited appeared in sections 2 and 3 of article 3, which read:
 

 “Section 2. Principle of Institutional Control and Responsibility. The control and responsibility for the conduct of intercollegiate athletics shall be exercised by the institution itself and, in the case of institutions having a membership in a regional athletic conference, by such conference.
 

 “Section 3. Principle of Sound Academic Standards. A student-athlete shall not represent his institution in intercollegiate athletic competition unless he has been admitted in accordance with the regular published entrance requirements of that institution; unless he is in good academic standing as determined by the faculty of that institution, and unless he is making satisfactory progress toward a degree as determined by the regulations of that institution.”
 

 CSUH is an “institution” for purposes of both sections and other provisions of the NCAA constitution in which the term appears. The FWC is a “regional athletic conference" for purposes of section 2.
 

 [2]
 

 “Article VI. Eligibility . . . Section 3—Scholarship Requirements. ...(e)... Entering freshmen students who upon graduation from high school predict less than 1.600 grade point average at a member institution according to NCAA procedures, shall not be eligible to compete in intercollegiate athletics until after they have earned at least a 2.0 (C) average for at least 10 units for any term. . . .”
 

 [3]
 

 The amended language appeared as subsection (b)(1) of section 6 of bylaw 4. In its pertinent context, it read as follows:
 

 “Section 6. Institutional Eligibility. The NCAA sponsors 26 national championship events of which 17 are National Collegiate Championship events and nine [are] National College Division Championship events. ... [A reference is made here to a listing of the 26 events which in another bylaw.]. . .
 

 “(b) A
 
 member institution
 
 shall not be eligible to enter a team or individual competitors
 
 in an NCAA -sponsored meet,
 
 unless the institution in the conduct of all
 
 its
 
 intercollegiate
 
 *467
 
 athletic programs: [¶] (1) Limits . . . eligibility for participation in athletics or in organized athletic practice sessions during the first year in residence to student-athletes who have a predicted minimum grade point average of at least 1.600 (based on a maximum of 4.000) as determined by. . . [designated sources]. . . .” (Italics added.)
 

 Freshmen who did not have the predicted 1.6 GPA were called “sub-predictors.” It may also be mentioned that the NCAA repealed this provision in 1973.
 

 [4]
 

 The Bergstrom letter stated in pertinent part: “This is in reference to your October 21, 1969, letter concerning
 
 eligibility for NCAA championship events.
 
 [¶] NCAA legislation provides that the rules of eligibility . . . become mandatory
 
 when a member institution
 
 enters an individual or a team in an NCAA championship event. The determination of eligibility rules for regular,
 
 inseason competition
 
 is the responsibility of the certifying institution or the athletic conference in which it may hold membership. [¶] Accordingly, it is permissible for a member institution (or conference) to permit a student-athlete, ineligible under NCAA legislation, to compete during the regular season and if his team is selected for NCAA championship play, withhold that player. . . .” (Italics added.)
 

 [5]
 

 The copy of O.I. 418 which was received in evidence is not dated, and the full record supports several inferences as to when it was published. Its text states in pertinent part: “A student-athlete who practices or participates
 
 while ineligible
 
 under the provisions of Bylaw 4-6(b) [i.e., the 1.6 rule] shall be charged with the loss of one year of practice and varsity eligibility by his institution for each year gained improperly, which shall be the next year the student is in attendance.” (Italics added.)
 

 It may be mentioned here that we find nothing in the NCAA
 
 1969
 
 constitution or bylaws which explicitly authorizes the promulgation of “Official Interpretations” or makes them binding upon any member unless and until they have been ratified by the full NCAA membership. O.I. 418 was apparently ratified by the members at their annual meeting in 1972.
 

 [6]
 

 The disciplinary proceedings were conducted, and the penalty was imposed, pursuant to various provisions of the NCAA constitution, its bylaws, and a documented “Enforcement Program” adopted by its full membership. Section 6(b) of article IV of the constitution provides that a member may be expelled or suspended, by a two-thirds vote of the full membership in convention, for “failing to maintain the academic or athletic standards required for membership or failing to meet the conditions ... of membership.” Section 6(c) provides that “[d]isciplinary or corrective actions other than termination of membership or suspension may be effected by a two-thirds vote of the members of the Council present and voting” at a duly noticed meeting. Section 6(c) does not specify any grounds upon which the council is authorized to impose discipline, and the enforcement program does not regulate its actions in this regard. A section of the program provides that a “NCAA penalty should be broad if the violation or violations [by a member] reflect a general disregard for the governing rules.” Another section indicates that “[p]robation for more than one year” is about as “broad” a penalty as a member may incur, short of expulsion or suspension by the full NCAA membership. The sum of these provisions vests the council with virtually unlimited and uncontrolled power to punish NCAA members who resist its actual or professed authority. The power may be exercised by two-thirds of the council “present and voting,” which means that a decisive disciplinary vote may be cast by a very few persons. In the present case, the terminal vote was apparently cast by no more than four men.
 

 [7]
 

 We here quote the opening brief. At this point and elsewhere, the brief cites the memorandum decision for such matters as what the trial court “held” and its definition of the issues. These matters are not mentioned in the findings of fact and conclusions of law. The references to the memorandum decision are therefore improper and may be disregarded. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 230, p. 4220.)
 

 *
 

 Assigned by the Chairperson of the Judicial Council.